**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────────────

**AKF, INC.,** *doing business as Fundkite*,

                           **Plaintiff,**

    **vs.**                                      **1:22-cv-269**
                                                  **(MAD/CFH)**

**HAVEN TRANSPORTATION BUSINESS**
**SOLUTIONS, INC.; and KIMBERLY CHIBICI,**
*also known as Kimberly Havelka-Chibici*,

                           **Defendants.**

─────────────────────────────────────────────

**APPEARANCES:**                            **OF COUNSEL:**

**KAMINSKI LAW, PLLC**           **SHANNA M. KAMINSKI, ESQ.**
P.O. Box 247
Grass Lake, Michigan 49240
Attorneys for Plaintiff

**HAVEN TRANSPORTATION BUSINESS**
**SOLUTIONS, INC.**
500 N. 3rd Street
Suite 206
Wausau, Wisconsin 54403
Defendant *pro se*

**KIMBERLY CHIBICI**
Defendant *pro se*

**Mae A. D'Agostino, U.S. District Judge:**

**ORDER TO SHOW CAUSE**

**I. INTRODUCTION**

      Plaintiff AKF Inc., doing business as FundKite ("Plaintiff" or "FundKite"), commenced

this action on March 18, 2022, asserting a claim for breach of contract against Defendant Haven

Transportation Business Solutions, Inc. ("Haven Transportation") and one claim for breach of

performance guaranty against Defendant Kimberly Chibici. *See* Dkt. Nos. 1, 5. Defendants, then

represented by counsel, answered Plaintiff's amended complaint on May 6, 2022. *See* Dkt. No. 7. Defendants' counsel subsequently moved to be relieved as counsel and for a stay of proceedings, which Magistrate Judge Hummel granted on December 22, 2022, and this case was stayed for thirty days to allow Defendants to obtain new counsel. *See* Dkt. Nos. 20, 22. Following a status conference on January 31, 2023, Defendants were provided an additional thirty days to obtain new counsel. At a status conference on February 28, 2023, Defendants informed the Court that new counsel had been secured and that new counsel would be making an appearance in this case on their behalf. Despite Defendants' representations to the Court, no new counsel has appeared in this matter on their behalf.

On November 16, 2023, Plaintiff moved for summary judgment on all claims. *See* Dkt. No. 41. Defendants did not formally respond to Plaintiff's motion for summary judgment, other than to submit a brief letter explaining that Defendant Haven Transportation is no longer in business and that they still have not obtained legal representation. *See* Dkt. No. 45.

Currently before the Court is Plaintiff's unopposed motion for summary judgment.

## II. BACKGROUND[1]

---

[1] Although Defendants were served with Plaintiff's motion for summary judgment, which was accompanied by a notice as required by Local Rule 56.2 (which cautioned that failure to respond to the motion could result in the Court entered judgment against them), *see* Dkt. No. 41, Defendants nevertheless failed to file any written opposition to the motion. Regardless, since "even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law," *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006), the Court must consider whether Plaintiff has met its burden for obtaining summary judgment. *See Jackson v. Federal Express*, 766 F.3d 189, 197 (2d Cir. 2014) (holding that "when a party, whether *pro se* or counseled, fails to respond to an opponent's motion for summary judgment, a district court may not enter a default judgment," but "must examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment").

On or about December 30, 2021, Plaintiff AKF, Inc. d/b/a FundKite ("FundKite" or "Buyer") and Defendant Haven Transportation ("Haven Transportation" or "Seller") entered into a Revenue Purchase Agreement (the "Agreement") under which FundKite purchased $219,368.00 in Receipts, defined as

> all of Seller's future sales, accounts, contract rights and other obligations and entitlements arising from or relating to the payment of monies from Seller's customers and/or third party payers and the proceeds thereof including, but not limited to all payments made by cash, check, electronic transfer or other form of monetary payment in the course of the Seller's business[.]

Dkt. No. 41-1 at ¶ 1; *see also* Dkt. No. 41-4 at 3.  In its answer, Haven Transportation admits to entering into the Agreement with Plaintiff.  *See* Dkt. No. 7 at ¶ 7.

On that same date, the sole owner of Haven Transportation, Defendant Chibici ("Owner"), executed a Guaranty of Performance of the Agreement under which she guaranteed prompt and complete performance of Haven Transportation's obligations under the Agreement, defined as the Guaranteed Obligations, which include the following:

> 1. SELLER's obligation not to enter into any arrangement, agreement, or a loan that relates to or encumbers Seller's Receipts or future revenue with any party other than BUYER, unless permitted in writing by BUYER;
>
> 2. SELLER's representations, covenants and warranties shall be truthful, accurate and complete and shall not be misleading in any material respect when made;
>
> 3. SELLER's obligation to remit the Receipts as required by the Agreement;
>
> 4. SELLER's obligation to provide Banking Records to BUYER in accordance with section 1.3 of the Agreement;
>
> 5. SELLER's obligation to not voluntarily transfer or sell all or substantially all of its assets, shares and/or membership interests without prior written consent of BUYER;

6. SELLER's obligation to not change, alter or terminate its Designated Account or payment card processor without prior written consent of BUYER;

7. SELLER's obligation to deliver Receipts as required by the Agreement without interruption by way of "stop payment" or any "block" on BUYER's debits.

Dkt. No. 41-1 at ¶ 3 (citing Dkt. No. 41-4 at 14).  The Guaranty of Performance provides that if Haven Transportation fails to perform any of the Guaranteed Obligations, FundKite may seek enforcement of the Guaranteed Obligations against the Owner.  *See* Dkt. No. 41-1 at ¶ 3.

Pursuant to the Agreement, FundKite was to obtain the Receipts it purchased from Haven Transportation by debiting $7,834.57 weekly (the "Initial Estimated Delivery Amount") from the Designated Account, which is defined as a bank account at Covantage Credit Union, and into which Haven Transportation was to deposit all Receipts collected.  *See id.* at ¶ 4.  The Initial Delivery Amount is intended to represent the Remittance Percentage, defined as 9% of Receipts. *See id.* at ¶ 5.  The Initial Delivery Amount is meant to equal the Remittance Percentage of weekly Receipts deposited by Haven Transportation into the Designated Account.  *See id.*  The Initial Estimated Delivery Amount was calculated based on Haven Transportation's Receipts, specifically, its average gross monthly Receipts, prior to the date of the Agreement determined by FundKite based on a review of historical data such as bank statements, accounts receivable reports, and credit card receipt information provided to FundKite by Haven Transportation.  *See id.*

The Initial Estimated Delivery Amount was subject to a reconciliation procedure that is set forth in Section 1.3 of the Agreement, which is an adjustment of the Initial Estimated Delivery Amount to ensure that subsequent weekly withdrawals from the Designated Account equals the Remittance Percentage of the total actual Receipts deposited by Haven Transportation into the

4

Designated Account.  *See id.* at ¶ 6.  Haven Transportation was provided with the option of

having a reconciliation conducted by FundKite on a weekly or monthly basis when it entered into

the Agreement.  *See id.*  Haven Transportation selected monthly reconciliation.  *See id.*

On or about December 30, 2017, FundKite wired the Disbursement Amount, defined as

the dollar amount FundKite would pay to Haven Transportation after deducting Service Fees set

forth in Appendix A of the Agreement, to Haven Transportation.  *See id.*  Haven Transportation

has acknowledged that it received the Disbursement Amount.  *See* Dkt. No. 7 at ¶ 12.  After

wiring the Disbursement Amount, FundKite commenced the weekly debits of $7,834.57 from the

Designated Account as provided for by the Agreement.  *See* Dkt. No. 41-1 at ¶ 8.

When a business selects monthly reconciliation, it is FundKite's policy and practice to

email the business each month and advise them of their right to a reconciliation.  *See id.* at ¶ 9.

That notice tells the business what documents are needed from them to perform the reconciliation

and asking that they respond to the email with the documents.  *See id.*  FundKite sent a

reconciliation notice to Haven Transportation via an email to Defendant Chibici on February 7,

2022, advising of its right to a reconciliation for January 2022 and asking for bank statements.

*See id.*  FundKite received no response to the email.  *See id.*

On or about March 6, 2022, FundKite received notice that it could not debit the Adjusted

Delivery Amount from the Designated Account because Covantage Credit Union, the bank where

the Designated Account was located, had been instructed to block FundKite's debits from the

Designated Account.  *See id.* at ¶ 10.  Section 3.1(j) of the Agreement provides that FundKite's

inability to successfully debit Receipts from the Designated Account due to any "block" placed on

FundKite's debits is an Event of Default under the Agreement.  *See id.* at ¶ 11.  One of the

Guaranteed Obligations set forth in the Guaranty of Performance is Haven Transportation's

5

obligation to deliver Receipts without interruption by way of "stop payment" or any "block" on FundKite's debits.  *See id.* at ¶ 12.

On March 7, 2022, even though it was not required to do so under the Agreement or Guaranty of Performance, FundKite sent a Notice of Event of Default to Haven Transportation and Defendant Chibici.  *See* Dkt. No. 41-1 at ¶ 13.  In response to the Notice of Event of Default, Defendant Chibici contacted FundKite and advised that the business was still operating, but that it learned that two of its employees embezzled money causing it short term financial hardship and that a thirty-day modification of the amount of the debits was needed to get Haven Transportation back on its feet.  *See id.*  FundKite agreed to the modification request and Defendant Chibici was informed on multiple occasions that the block would need to be removed for the debits under the Temporary Modification to occur.  *See id.*

On March 9, 2022, FundKite was contacted by National Credit Partners, a debt settlement company, stating that Haven Transportation had hired them to resolve the "debt." *Id.* at ¶ 14. Then, on March 14, 2022, FundKite received notice that the initial debt under the Temporary Modification was rejected because the block was never removed.  *See id.* at ¶ 15.  FundKite claims that it has since learned in emails from Defendant Chibici that the business was continuing to operate but that Haven Transportation was told by National Credit Partners to not remove the block and to make payments to it rather than to FundKite so that it could negotiate the debt.  *See id.*  Defendant Chibici also told FundKite that Haven Transportation has paid at least $25,000 to National Credit Partners since March 9, 2022.  *See id.*

Refusal to deliver the Remittance Percentage of Receipts as required by the Agreement is an Event of Default under the Agreement and the obligation to remit Receipts in accordance with the terms of the Agreement is a Guaranteed Obligation.  *See id.* at 41-1 at ¶ 16; *see also* Dkt. No.

41-4 at 7 & 14.  Pursuant to the Agreement, upon the occurrence of an Event of Default, the Remittance Percentage equals 100% and the full uncollected Purchased Amount of Receipts, plus all fees and charges including reasonable attorney's fees, costs, and default fees, becomes immediately due and payable in full and FundKite is permitted to proceed to protect and enforce its rights and remedies by suit in equity or by action at law or both, whether for specific performance of any event, agreement or other provision contained in the Agreement, or to enforce the discharge of Haven Transportation's obligations or any other legal or equitable right or remedy.  *See* Dkt. No. 41-1 at ¶ 17; *see also* Dkt. No. 41-4 at 7-8.

As of the date this case was initiated, FundKite had collected a total of $62,676.56 in Receipts it purchased under the Agreement.  *See* Dkt. No. 41-1 at ¶ 18.  Thus, the amount of uncollected Receipts as of the date this case was initiated was $156,691.44.  *See id.*; *see also* Dkt. No. 41-3 at ¶ 18.  Pursuant to Section 3.2 of the Agreement and Appendix A of the Agreement, upon an Event of Default occurring under the Agreement, FundKite is entitled to a default fee in the amount of 25% of the uncollected Purchased Amount of Receipts (calculated from the date of the Event of Default), which amount equals $39,172.86.  *See* Dkt. No. 41-1 at ¶ 20; *see also* Dkt. No. 41-4 at 19.  Since the case was initiated, FundKite has collected an additional $64,617.40 primarily via Assignment Notices sent pursuant to the Uniform Commercial Code, making the total amount collected to date $127,293.96.  *See id.* at ¶ 21; *see also* Dkt. No. 41-7.  As of May 15, 2023, the total amount due and owing to FundKite is $131,246.90, which includes $92,074.04 in Uncollected Receipts and $39,172.86 for the Default Fee.  *See* Dkt. No. 41-1 at ¶ 22.

According to FundKite, it is its policy and practice to have more than one telephone conversation with the owner of the business seeking funding prior to agreeing to enter into a transaction, in addition to engaging in traditional due diligence of examining financial

information.  *See id.* at ¶ 23.  The first conversation is an interview that is part of its due diligence in which FundKite obtains information regarding the business, its operations, its customers and how it earns revenue, among other information.  *See id.*  Sometimes more than one conversation is required to obtain this information.  *See id.*  After due diligence has been completed and FundKite wishes to enter into the transaction, it has another conversation with the owner of the business that is seeking the funding in which it explains all the terms of the proposed Agreement and answers any questions.  *See id.*  As part of this conversation, FundKite explains that the transaction is not a loan but a purchase transaction and requires the owner of the business to acknowledge this along with the terms of the Agreement.  *See id.*  FundKite had these conversations with Defendant Chibici prior to entering into the Agreement.  *See id.*

### III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36

(citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    Defense of Usury**

Upon review of Plaintiff's complaint, FundKite's motion for summary judgment and the Agreement, the Court has serious concerns that the Agreement is usurious and, therefore, unenforceable and void under New York law, which the Court addresses below.

*1. Applicable Law*

To prove the defense of criminal usury under New York law, "a debtor must allege and prove by clear and convincing evidence that [(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the holder or payee with the intent to take interest in excess of the legal rate [of 25% per annum]." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 183 (1st Dep't 2013) (citing *Giventer v. Arnow*, 37 N.Y.2d 305, 309 (1975)); *see also* N.Y. Penal Law § 190.40 (McKinney 2022) (making it unlawful to charge interest on a loan "at a rate exceeding twenty-five per centum per annum").  Under New York law, the defense of civil usury (*i.e.*, interest over 16%) is not available to

9

corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (*i.e.*, interest over 25%) in a civil action. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326 (2021). On summary judgment, a debtor may meet its "burden of proof simply by submitting the [contract] evidencing the usurious transaction." *Funding Grp., Inc. v. Water Chef, Inc.*, 19 Misc. 3d 483, 488 (Sup. Ct., N.Y. Cnty. 2008); *see also Matter of Dane v. Hood*, 55 A.D.2d 224, 226 (3d Dep't 1976) ("The showing, as here, that the note reserves to the lender an illegal rate of interest satisfies respondents' burden of proving a usurious loan").[2]

"Usury laws apply only to loans or forbearances, not investments. ... If the transaction is not a loan, 'there can be no usury, however unconscionable the contract may be.'" *Seidel v. 18 E. 17th St. Owners*, 79 N.Y.2d 735, 744 (1992) (internal citation and quotation omitted). Under New York law, "[w]hen determining whether a transaction is a loan, substance – not form – controls." *Adar Bays*, 37 N.Y.3d at 334 (citation omitted). Courts must examine whether the lender or payee "'is absolutely entitled to repayment under all circumstances'" and the "principal sum advanced is repayable absolutely." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (2d Dep't 2020) (quotation and other citation omitted).

Put differently, when determining whether a transaction was a true sale of receivables or a loan, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the

---

[2] Although Defendants did not respond to FundKite's motion for summary judgment, they did submit an answer to the amended complaint when they were represented by counsel. *See* Dkt. No. 7. In their answer, Defendants specifically assert in an affirmative defense that the transaction at issue "was illegal," citing to the excessive "interest rate" that was required to be repaid on the loan which "would be paid off in 28 weeks." Dkt. No. 7 at ¶¶ 35-52. Although Defendants did not use the word "usury" in their answer, it is clear from the substance of this affirmative defense that they had intended to raise this argument while represented by counsel. *See* 9 Williston on Contracts: *Usury: Effect on Agreements* § 20:40 (4th ed.) (citing cases finding that the defense of usury was not waived where it was apparent from the face of the complaint).

performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995); *accord Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a *bona fide* purchase of receivables and the transaction is, in substance, a loan. *Adar Bays*, 37 N.Y.3d at 334. In addition to an economic analysis of the transaction, the New York Court of Appeals has also considered objective indicia of the parties' intent to "distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason." *Id.*

Courts have considered, among others, the following three factors to analyze who bears the ultimate risk that the borrower's customers will not pay: (1) whether there is a reconciliation provision; (2) whether the agreement has an indefinite term and (3) whether the lender has any recourse should the merchant declare bankruptcy. *See LG Funding*, 181 A.D.3d at 666 (citations omitted); *see also Davis v. Richmond Cap. Grp., LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021) (holding the RICO claim based on unlawful debt was sufficiently alleged based on allegations that "defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount, and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's

11

inability to pay or bankruptcy") (citation omitted); *Haymount Urgent Care PC*, 2022 WL 2297768, at *7 (same).  The issue is ultimately about whether the transaction represented a real transfer of risk so the economic substance of the transaction was a loan, not a purchase of receivables.  *See id.* (citation omitted); *see also Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20 Civ. 5120, 2022 WL 1997207, *10 (S.D.N.Y. June 6, 2022) (holding in a summary judgment motion that the three LG Funding factors and other considerations suggested that the purchase of receivables in reality constituted a loan).

### 2. The Agreement is a Loan

Here, both Agreement and Guarantee of Performance explicitly state that the Agreement is not for a "loan" but is rather "a purchase of the Purchased Amount of Receipts" and "that BUYER has not offered any loans to SELLER." *E.g.*, Dkt. No. 41-4 at 14-15.  Despite this language, the caselaw is clear that the Court must look to the substance of the Agreement and not the characterization of the arrangement by the parties.

Upon review of the submissions, the Court finds that the Agreement is almost certainly a loan.  First, the Agreement's reconciliation provision and the monthly notice regarding Haven Transportation's right to a reconciliation make clear that the right to a reconciliation only occurs monthly and is contingent on Haven Transportation submitting the paperwork required by FundKite.  *See* Dkt. No. 41-4 at 4; *see also* Dkt. No. 41-5 at 1-2; Dkt. No. 41-3 at ¶ 9.  Further, the Agreement defines the failure to pay the weekly Delivery Amount as an irremediable infraction that foreclosed any possibility of future reconciliation.  As such, any reconciliation under the Agreement was very unlikely and difficult to obtain, and this factor weighs in favor of finding that the Agreement constituted a loan.

Second, while the Agreement states no explicit or definite term, the term is readily discernable from the Agreement's payment structure.  Barring any reconciliation, the Agreement mandated that FundKite would debit $7,834.57 weekly until Haven Transportation paid $219,368.00.  *See* Dkt. No. 41-1 at ¶¶ 1, 4, 8.  The term of the Agreement was, therefore, twenty-eight (28) weeks.[3]  *See In re GMI Grp., Inc.*, 606 B.R. 467, 488-89 (N.D. Ga. 2019) (determining the payment term based on the "payment schedule" consisting of the number of days until the required amount was paid in full); *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-CV-9607, 2022 WL 2829913, *6 (S.D.N.Y. July 20, 2022) ("[Although the contract] provides for a seemingly indefinite term, ... a de facto fixed term plausibly exists.  The period of payment can be easily calculated by dividing the amount [defendant] owes by the amount of daily payments").  This factor, therefore, weighs in favor of finding that the Agreement was for a loan.

Third, and finally, the terms of the Agreement would protect FundKite in the event of Haven Transportation's bankruptcy.  In the Agreement, FundKite states that it is "taking the risk that Receipts may be remitted more slowly than BUYER may have anticipated ... or the full Purchased Amount may never be remitted because SELLER's business went bankrupt or otherwise ceased operations in the ordinary course of business, and SELLER has not breached this Agreement," thereby preventing FundKite any recourse.  Dkt. No. 41-1 at 3-4.  Despite these assertions in the Agreement of being left without recourse in the event of a bankruptcy, it seems virtually certain that FundKite would be able to file a claim in any bankruptcy proceeding, as a secured creditor, for any remainder of the $219,368.00 owed.  In fact, in *AKF, Inc. v. Western*

---

[3] This period is arrived at by dividing the full amount to be paid – $219,368.00 – by the Delivery Amount of $7,834.57, which equals 28.00000510557695 weeks.  For purposes of this discussion, the Court will simply assume that FundKite would have forgiven the $0.04 underpayment or simply increased the final payment by $0.04 to make up for the shortage.

*Foot & Ankle Center*, 632 F. Supp. 3d 66 (E.D.N.Y. 2022), the court reached this very

conclusion.  Specifically, that court found as follows:

> That is because a filing of bankruptcy, which invariably involves an
> actual or projected negative cash stream, automatically stays "any
> act to obtain possession of property of the [debtor's] estate ... or to
> exercise control over property of the estate.' 11 U.S.C. § 362(a)(3).
> This "provides a debtor with breathing room from the claims of its
> creditors," and "allows the bankruptcy court to centralize all
> disputes concerning property of the debtor's estate in the bankruptcy
> court." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir.
> 1990).  The Bankruptcy Code "sets forth a basic system of priority,
> which ordinarily determines the order in which the bankruptcy
> court will distribute assets of the estate.  Secured creditors are
> highest on the priority list, for they must receive the proceeds of the
> collateral that secures their debts." *Czyzewski v. Jevic Holding
> Corp.*, 580 U.S. 451, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017)
> (citing 11 U.S.C. § 725).

*Id.* at 78-79.  In making these observations, the court found that "rather than having no recourse,

as a secured creditor, AKF would be 'highest on [Defendants'] priority list' in the event of a

bankruptcy." *Id.* at 79 (citation omitted).

In fact, FundKite has in the past previously prevailed in bankruptcy court.  In *Capozzolo*

*v. AKF, Inc.*, 626 F. Supp. 3d 604 (W.D.N.Y. 2022), FundKite filed an adversary proceeding

against a debtor that had entered into a "Revenue Purchase Agreement" who subsequently

stopped making payments to FundKite and thereafter declared bankruptcy.  *See id.* at 606-07.

FundKite filed the proceeding seeking a declaration that its **"loan"** to the debtor was

nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6).  *See id.* (emphasis

added).  FundKite prevailed in that case, with the bankruptcy court finding that the debt was

obtained by the creditor through a materially false statement regarding the debtor's financial

condition in violation of 11 U.S.C. § 523(a)(2)(B).  *See id.*  Notably, the agreement at issue in

*Capozzolo* appears to be materially indistinct from the Agreement at issue in the present matter.

14

Accordingly, the Court finds that, notwithstanding the disclaimer contained in the Agreement, FundKite would have recourse in the event that Haven Transportation became bankrupt, which weighs heavily in favor of finding that the Agreement was a loan.

### 3. The Agreement Charges a Usurious Interest Rate

Having determined that the Agreement almost certainly constitutes a loan, the Court must now determine whether the interest rate charged was usurious.

In determining whether the interest charged exceeded the usury limit, courts must apply the traditional method for calculating the effective interest rate as set forth in *Band Realty Co. v. North Brewster, Inc.*, 37 N.Y.2d 460 (1975).  *See Canal v. Munassar*, 144 A.D.3d 1663, 1664 (4th Dep't 2016) (citation omitted); *Miller Plan. Corp. with Delta Funding Corp. v. Wells*, 253 A.D.2d 859, 859-60 (2d Dep't 1998) (same); *see also* 72 N.Y. Jur. 2d Interest and Usury § 165 ("Whether a usurious rate of interest was exacted [is a question of law when] there is no material conflict in the evidence, and only one conclusion can reasonably be drawn from the facts proved").

Pursuant to the *Band* formula, the "true" annual interest rate is determined by taking the "discount" — *i.e.*, the difference between the amount advanced to the borrower and the amount owed to the lender — dividing that amount by the number of years in the term of the loan, adding that amount to the interest rate stated on the note, and dividing this sum by the difference between the principal and the discount (*i.e.*, the net advance).  *Canal*, 41 N.Y.S.3d at 829 ("In applying the [*Band* formula], the discount, divided by the number of years in the term of the [loan], should be added to the amount of interest due in one year, and this sum is compared to the difference between the principal and the discount in order to determine the true interest rate") (internal quotation marks omitted); *Shifer v. Kelmendi*, 204 A.D.2d 300, 300-01 (2d Dep't 1994) (applying

15

the *Band* formula to a one-year loan); *see also Band*, 37 N.Y.2d at 462 (stating that "discount" for

a loan in the amount of $300,000, where the lender advanced $261,000, to be $39,000); *Bakhash*

*v. Winston*, 134 A.D.3d 468, 469 (1st Dep't 2015) ("Where, as here, the loan is for less than a

year, the interest rate is annualized"); *Boswick v. Bronte SPV LLC*, 63 Misc.3d 1204A, *3 (Sup.

Ct., Suffolk Cnty. 2019) ("Fees, including loan origination fees, which are deemed interest for the

purposes of determining whether an interest rate charged exceeds the usury limit, are

annualized").

      Here, FundKite advanced $154,663.00 to receive back $219,368.00, generating a discount

of $64,705.00.  The sum of $219,368.00 is the "principal." *Canal*, 144 A.D.3d at 1664 (finding

that in a mortgage where $127,000 was disbursed to a borrower in return for a payment of

$170,000, "the principal ... [was] $170,000").  The Agreement, on its face, states that it charges no

interest.  *See id.* at 1663 (determining the amount of interest to be 0% when the contract "state[d]

that the interest rate during the term of the note would be 'zero' (0.00%)").  As noted above, the

term of the loan under the Agreement was twenty-eight (28) weeks.  *See In re GMI Grp., Inc.*,

606 B.R. at 488-89 (calculating interest using the number of days until payment was due as the

term of the loan).

      Thus, the *Band* formula reveals that the Agreement charged 77.70% in effective interest,

which is arrived at as follows:

$$\frac{\text{Discount (64,705)}}{\text{Term of Loan in years (28/52) (0.5384615384655385)}} + \text{Interest on the Note (0\%)} = \$120,166.43$$

$$\frac{\$120,166.43}{\text{Principal (219,368) - Discount (64,705)} = \$154,663 \text{ (Net Advance)}} = 77.70\% \text{ (effective interest rate)}$$

Because the term of the loan equals twenty-eight (28) weeks, it must be annualized. *See Bakhash*, 134 A.D.3d at 469 (annualizing a four-month loan by multiplying it by three). Determining the annualized interest rate is accomplished as follows:

$$\frac{\text{Duration of a Year (52 weeks)}}{\text{Term of Loan out of Year (28 weeks)}} \times \text{Effective Interest (77.70\%)} = 144.3\% \text{ (annualized interest).}$$

Because the annualized effective interest rate exceeds the statutory maximum of 25% by a magnitude of nearly six times, it is patently usurious.

### 4. Usurious Intent

Usurious intent is the volitional decision "to charge [an interest other] than the legal rate as evidenced by the [contract]," not any actual subjective motivation "to violate the usury statute." *Matter of Dane's Estate*, 55 A.D.2d 224, 226 (3d Dep't 1976); *Freitas v. Geddes Sav. & Loan Ass'n*, 63 N.Y.2d 254, 262 (1984). "[W]here usury does not appear on the face of the note, usury is a question of fact." *Freitas*, 63 N.Y.2d at 262 (citation omitted). However, when a transaction's usurious nature is obvious, usurious intent is imputed as a matter of law. *See id.*

"The New York Court of Appeals has articulated two tests for identifying transactions so patently usurious such that usurious intent is imputed as a matter of law. The first is the 'usurious effect' test, focusing on the transaction's usurious consequences." *Western Foot & Ankle Ctr.*, 632 F. Supp. 3d at 81 (citing *Fiedler*, 50 N.Y. at 443) (other citations omitted). "The second, stemming from the *Freitas* decision, is the 'usurious on its face' test which asks whether the usury, usually the interest rate itself, 'appear[s] on the face of the note[.]'" *Id.* (citing *Freitas*, 63 N.Y.2d at 262) (other citations omitted).

Here, as in *Western Foot & Ankle Ctr.*, which involved the same language and same lender as the present case, the Court finds that usurious intent can be imputed under either test.

First, under the usurious effect test, the transaction readily allows imputation of intent.  Against collateral that included Haven Transportation's Receipts and Defendant Chibici's Guaranty, FundKite loaned money at 144.3% interest, which far exceeds the statutory limit.  "Thus, 'the interest [is] so large' that 'intent to provide for the payment of interest beyond the legal rate will necessarily be imputed[.]'" *Western Foot & Ankle Ctr.*, 632 F. Supp. 3d at 81 (quoting *Fiedler*, 50 N.Y. at 443).  Second, under the facial test, the usurious nature of the transaction is readily visible from the contract, notwithstanding the Agreement's boilerplate disclaimers that it is "not a loan" and charges no interest.  "Although the New York Court of Appeals has not considered the effect of disclaimers of the kind the RPA contains, existing law sufficiently guides the Court.  Under New York law, maneuvers of denial inserted into a contract do not automatically render it non-usurious." *Id.* at 81-82 (citing cases); *see also  Simsbury Fund, Inc. v. New St. Louis Assocs.*, 204 A.D.2d 182, 182 (1st Dep't 1994) ("[L]anguage [in the contract] purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do[es] not make [it] nonusurious"); *Bakhash*, 134 A.D.3d at 469 ("[Although] the note says, 'in no event shall the rate of interest ... exceed [25%] and any interest paid in excess of [25%] shall be ... refunded[,] ... that does not make the [contract] nonusurious").  Instead, the First Department recently opined that intent may be imputed when a court can "glean[ ]" the usury "from the face of an instrument." *Blue Wolf Capital Fund II, L.P. v. American Stevedoring Inc.*, 105 A.D.3d 178, 183 (1st Dep't 2013) (citing *Fareri v. Rain's Intl.*, 187 A.D.2d 481, 482 (2d Dep't 1993)).

Here, the Agreement's language itself clearly indicates usury.  From the four corners of the contract, the Court has determined an interest rate at nearly six (6) times the statutory limit, ostensibly backed by collateral.  As in *Giventer* and *Western Foot & Ankle Ctr.*, the language of the contact itself – *i.e.*, the transfer of $154,663.00 in return for $219,368.00 paid under

demanding conditions, including an implicit term of twenty-eight (28) weeks – "was merely a way of expressing" a loan at a grossly usurious rate. "The existence of a single boilerplate disclaimer, that may have also appeared in a footnote or printed in small letters on the back of the [Agreement], does not mean that the usury simply fades away from the [Agreement's] 'very face' or that the unlawful intent is no longer 'apparent[.]'" *Western Foot & Ankle Ctr.*, 632 F. Supp. 3d at 82 (quotation omitted). Thus, it appears that usurious intent may be imputed as a matter of law.

### 5. Remedy

Because the Court has determined *sua sponte*, as prompted by the affirmative defense raised in Defendants' answer, the Court finds that it is only appropriate to afford FundKite an opportunity to respond prior to determining the appropriate remedy. However, the Court makes the following observations regarding the potential consequences of determining that the Agreement is usurious in violation of New York law.

It was once an open question under New York law whether a successful defense of criminal usury eliminates the borrower's obligations to pay back the loan. *See Venture Mortgage Fund, L.P. v. Schmutz*, 282 F.3d 185, 189 (2d Cir. 2002); *Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, No. 01-CV-5207, 2007 WL 4563487, *5 (S.D.N.Y. Dec. 18, 2007). However, in 2021, in response to a certified question from the Second Circuit, the New York Court of Appeals held that "loans proven to violate the criminal usury statute are subject to the same consequences as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays*, 37 N.Y.3d at 333; *see also Seidel*, 79 N.Y.2d at 740 ("[T]he borrower can simply keep the borrowed funds and walk away from the agreement").

As such, the law is now settled. Unless FundKite is able to show cause why the Court has erred in its analysis of the Agreement and its usurious nature, the only appropriate remedy is for

the Court to enter judgment in Defendants' favor and declare that the Agreement – and by extension, the Guaranty – are invalid and unenforceable.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 41) is **DENIED without prejudice**; and the Court further

**ORDERS** that Plaintiff's shall **SHOW CAUSE** in **THIRTY (30) DAYS** why the Agreement is not usurious and, therefore, valid and unenforceable under New York law; and the Court further

**ORDERS** that Defendants may file a response within **TWENTY-ONE (21) DAYS** of receipt of Plaintiff's response to this Order to Show Cause; and the Court further

**ORDERS** that Plaintiff's counsel shall serve a copy of this Order to Show Cause by Certified Mail, return receipt requested, on Defendants, and file proof of completed service with the Court, within **SEVEN (7) DAYS** of the date this Order to Show Cause is issued; and the Court further

**ORDERS** that if Plaintiff fails to respond to this Order to Show Cause within **THIRTY (30) DAYS** of the filing date of this Order to Show Cause, the Clerk of the Court shall enter judgment in Defendants' favor and close this case without further order from this Court: said judgment shall include language finding that the Agreement and the Guaranty are invalid and unenforceable; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 11, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

21